1
2
3
4          **UNITED STATES DISTRICT COURT**
5          **DISTRICT OF NEVADA**
6
7    DAVID CUNNINGHAM,                          )
8                              Plaintiff,       )        Case No. 2:13-cv-02025-LDG-GWF
                                                )
9    vs.                                        )        **FINDINGS AND**
                                                )        **RECOMMENDATION**
10   CAROLYN W. COLVIN,                         )
     Commissioner of Social Security,          )
11                                              )        Motion to Remand (#22)
                             Defendant.         )        Cross-Motion to Affirm (#24)
12   _____        )        Amended Motion to Remand (#25)

13          This case involves judicial review of an administrative action by the Commissioner of

14   Social Security denying Plaintiff David Cunningham's claim for disability benefits under Title II of

15   the Social Security Act.  Plaintiff's Complaint (#3) was filed on November 15, 2013.  Defendant's

16   Answer (#10) was filed on January 14, 2014, as was a certified copy of the Administrative Record

17   (the "AR").  *(See* #11).  This matter has been submitted to the undersigned United States

18   Magistrate Judge for Findings and Recommendations on Plaintiff's Motion to Remand (#22), filed

19   on June 19, 2014, Plaintiff's Amended Motion for Remand (#25), filed on July 23, 2014, the

20   Commissioner's Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Remand (#23,

21   #24), filed on July 22, 2014, and Cunningham's Reply (#30), filed on September 10, 2014.

22                              **BACKGROUND**

23          **A.      Procedural Background**

24          On June 24, 2010, Plaintiff filed a Title II application for a period of disability and disability

25   insurance benefits, alleging that his disability began on May 28, 2010.  AR 21.  The Social Security

26   Administration denied the Plaintiff's claim on February 15, 2011.  AR 95.  The Plaintiff filed for

27   reconsideration, which was denied on June 14, 2011.  AR 103.  Plaintiff requested a hearing before

28   an Administrative Law Judge (ALJ) and testified at a hearing before the ALJ on May 9, 2012.  AR

51-81.  Vocational Expert Robin Generaux also testified at the hearing.  AR 82-89.  The ALJ

determined that the Plaintiff was not disabled from June 24, 2010 through August 9, 2012.  AR 21-

29.  Plaintiff appealed the decision of the ALJ to the Appeals Council on August 28, 2012.  AR 15.

The Appeals Council denied Plaintiff's request for review on August 28, 2013.  AR 1-4.  Plaintiff

then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

### B.   Factual Background

Plaintiff David Cunningham was born on May 11, 1967.  AR 148.  He is 6'0" tall and

weighed 320 pounds in June 2012.  AR 448.  Plaintiff has a high school education.  AR 52, 168.

At the time of his application for disability benefits in July 2010, Plaintiff was married to Latesia

Holliday, but stated that he was residing alone.  AR 148, 156.  Mr. Cunningham testified at the

May 9, 2012 hearing, however, that he had been divorced for approximately three years and had

sole custody of his three children - boy/girl twins then age four, and another daughter then age 5.

AR 51-52.

**1.  Plaintiff's Disability/Work History Reports and Hearing Testimony:**  Mr.

Cunningham stated in his initial 2010 disability report that he stopped working on May 28, 2010

due to his medical conditions.  AR 167.  He testified at the May 9, 2012 hearing that he stopped

working because he "wasn't feeling real good at all" and was having problems breathing and with

his heart.  AR 59.  According to Plaintiff's August 3, 2010 Work History Report, his last job was as

a driver for an outdoor advertising company from 2007 to 2010.  AR 174.  From 2004 to 2006, he

worked as pipefitter and laborer.  AR 174.  Prior to that he was employed as an armed security

officer.  He also worked in a job where he kept track of medications for persons residing in a half-

way house or community housing facility.  AR 54-59, 174.

In his initial 2010 disability report, Plaintiff listed his disabling conditions as congestive

heart failure and diabetes, noting that he needed oxygen and had a defibrillator.  AR 167.  He

stated that he was taking Lisinporil and had seen Dr. William Resh for his heart problems in

January, 2010, and June, 2010, with a follow up visit scheduled in July, 2010.  AR 169-170.  Mr.

Cunningham also listed two emergency room visits in June 2010 at Sunrise Hospital and Valley

Hospital.  AR 171.  He reported that he was treated at Sunrise Hospital after he "passed out" at a

bus stop.  He was stabilized and released, and no tests were performed.  AR 171.  Mr. Cunningham was admitted to Valley Hospital for problems with chest pains and fainting, and was treated with the implantation of a cardiac defibrillator ("pacemaker").  AR 171.  In a subsequent disability report dated March 8, 2011, Mr. Cunningham stated that his condition was getting worse.  AR 182-187.  He reported "having dizzy spells" that make me afraid to go out."  He could no longer walk to the end of the block, and was in constant pain.  He reported that he was seen at Nevada Heart and Vascular Center between January 2010 and February 3, 2011 for his heart condition, adjustments to his pacemaker and medications.  AR 183.  He was also seen at UMC (University Medical Center) Nellis Clinic between August and October of 2010 for diabetes, high blood pressure, COPD, and pain.  AR 184.  Mr. Cunningham's updated prescription list included carvedilol, digoxin, furosemide, humalog, hydrocodone, insulin, lisinopril, losartan potassium, simvastain, and spironolact.  AR 184.  In response to the question how his conditions affected his ability to care for himself, Mr. Cunningham responded that "it takes longer to handle my personal needs.  I also have to be careful what types of soaps and lotions that I use because they make me break out.  I get tired just getting bathed and dressed.  I only fix easy things to eat."  AR 185.  With respect to changes in his daily life, he stated:  "I cannot do anything.  I cant (sic) lift or move things.  I have trouble walking, trouble getting out of chairs.  I can climb stairs but it is extremely hard.  I don't visit with others.  I stay to myself most of the time.  I read and watch tv on and off.  I no longer drive because of the medical problems I have - I use the bus to get around."  AR 185.

In a disability report dated July 29, 2011, Mr. Cunningham stated that his physical and mental condition had gotten worse.  His memory was slower, his blood pressure was fluctuating, he could not walk more than a block, and he needed a friend to help change his clothes.  AR 192.  He reported that he had been seen by Dr. John Bowers at the Nevada Heart and Vascular Center from October 28, 2010 through March 17, 2011 for pacemaker readings and checks on his home monitor.  AR 193.  He listed his current medications as carvedilol, digoxin, hydrocodone, lantus solostar, lisinopril, losartan potassium, plavix, simvastatin, and spironolactone.  AR 194.

Mr. Cunningham testified at the May 9, 2012 hearing that he lived in an apartment with his three young children.  AR 51-52.  He stated that he weighed 320 pounds and that his weight

fluctuated between five and ten pounds. AR 60. He reported that he had carpal tunnel syndrome in both hands, and that he is right handed. AR 60-61. He stated that he was unable to work due to his heart condition and his diabetes which was not fully controlled, despite his use of insulin. AR 61-62. Although Mr. Cunningham had only recently been diagnosed with carpal tunnel syndrome, he stated that he had felt tingling in his hands for three or four years. He also stated that "my hands lock up a lot." AR 63. The problems with his hands prevented him from riding a motorcycle, and he also struggled to tie his shoes, drive an automobile, and use eating utensils. AR 62-64.

Mr. Cunningham testified hat he cared for his children in the mornings before they went to school in the afternoon. AR 65. He played with the children and helped them learn their alphabet. His cooking was limited to the use of a microwave. When he was unable to cook, his neighbor came over to help. He was able to do some laundry two or three times a month. AR 66. He had to teach the children how to dress themselves, because he was unable to dress them. AR 67. He was unable to sweep or mop floors, but could sometimes do dishes. While his children were at school, he spent his time making appointments and preparing for the weekend. AR 68. He stated that on weekends, he took the children to the park, where he was able to toss a ball for them. AR. 68-69. A neighbor gave them a ride to the park. AR 69. He testified that he usually went to the grocery store twice a week, with the biggest shopping trip at the beginning of the month. AR 69-70. The trips usually lasted one hour, with the longest being one and a half hours.

Mr. Cunningham testified that he smoked two cigarettes a day, and did not drink or use drugs. AR 70. He stopped driving in 2010 due to complications from his heart, hands, and diabetes. AR 71. He stated that he could not stand in one place for more than 15 to 30 minutes. He then had to sit, but could not do so for too long before his low back started to hurt. It took him up to twenty minutes to walk a block due to shortness of breath. AR 72. He estimated that he could sit for approximately 20 minutes at a time, and could only lift about 30 pounds. AR 73.

Mr. Cunningham testified that he got chest pains three or four times a day that lasted for two or three minutes at a time. He also perspired and grew short of breath when he got these pains. His chest pains went away when he took his Coreg medication. AR 74. He reported shortness of breath from walking, bending, or lifting. AR 75. Lifting or walking too fast also caused him to

become light-headed or dizzy.  He usually got the chest pains when he over-exerted himself.  AR 76.  He also testified that he now had weakness in his arms and legs.  AR 77.  He got headaches twice a day for thirty minutes at a time.  Mr. Cunningham attributed the numbness and tingling in his arms to diabetes, and not to carpal tunnel syndrome.  AR 77-78.  He testified that this numbness and tingling occurred twice a day and lasted two or three hours.  AR 78.  He also had numbness or tingling in his feet, which he described as a sharp, pin like pain.  This occurred once a day, usually at night.  He attributed this pain to fatigue and exertion.  AR 79.  His knees and legs also swelled.  This condition was treated with medication.  AR 80.  Mr. Cunningham testified that his back pain radiated down his leg to as low as three inches below his kneecap.  AR 81.  He experienced this back pain twice a day.  He testified that he could not perform a sit-down job because of the low back pain, the pain and swelling in his legs and feet, and because of his heart condition and other problems.

**2. Vocational Expert's Testimony:**  Vocational Expert ("VE") Robin Generaux testified at the May 9, 2012 hearing.  After establishing Plaintiff's prior work history as a driver (medium work), pipefitter (heavy work), security guard (light work), and lawn service worker (heavy work), AR 82, the ALJ asked the VE the following hypothetical question:

> So if we had a person of the Claimant's age, education and experience limited to light work – so that would eliminate the driver, it would eliminate the lawn service helper, the pipefitter.  It would leave only the security guard and community program aide.  However, if that person could only occasionally climb ramps or stairs; never climb ropes, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; avoid concentrated exposure to extreme heat or cold; avoid concentrated exposure to excessive vibration; avoid concentrated exposure to chemicals, dust, fumes, odors, gases, and other pulmonary irritants; avoid even moderate exposure to hazardous machinery, unprotected heights, and operational control of moving machinery; could such a person with those restrictions perform the work of a security guard?

AR 85-86.

The VE responded that the person could not work as a security guard.  AR 86.  She testified, however, that such a person could work as a community program aide which appeared to fit one of Plaintiff's prior employments.  The VE also stated that the hypothetical person could perform the light duty job of "hand packer."  The ALJ asked whether this job would still be

available if a "sit/stand option" was added to the hypothetical.  The VE testified that the hand packager job would still be possible, but the occupational base for that work would be eroded by at least 70 percent.  AR 86.  The VE testified that other light duty jobs with a sit/stand option that the hypothetical person could perform included ticket taker with a 30% erosion of the occupational base, and interviewer with a 20% erosion.  AR 87.  The VE testified that the hypothetical person with the sit/stand option could also perform the sedentary jobs of general office clerk with 20% erosion, order filler with 50% erosion, and information clerk with 20% erosion.  AR 87-88.  The VE testified that the hypothetical person could not work as a parking lot attendant because of the exposure to gases and fumes.  AR 88.  Plaintiff's counsel asked whether the hypothetical person would be able to perform any type of competitive employment if he was required to take rest breaks of up to 15 minutes per hour.  The VE responded that this requirement "would preclude competitive employment."  AR 89.

   **3. Medical Records and Reports:** Mr. Cunningham was hospitalized at Valley Hospital Medical Center from June 1-5, 2010, with a significant recent history of cardiomyopathy.  He reported a past history of diabetes, and stated that he had quit smoking one month ago and quite alcohol six months ago.  AR 244.  According to the hospital admission report, Mr. Cunningham complained of multiple episodes of chest pain on that or the previous day.  The pain was left-sided and pressure-like with no radiation.  The pain was associated with diaphoresis (sweating), shortness of breath and bilateral hand numbness.  Mr. Cunningham also reported increased swelling in his legs during the past two weeks, and stated that he was currently being treated for hypertension and diabetes.  He reported a prior hospitalization in 2008 for syncope (loss of consciousness) "in which he had a stress test read by Dr. Resh from Nevada Heart and Vascular Surgery that showed an estimated ejection fraction of 17%."  AR 253.  Dr. Arjun Gururaj, a consulting cardiologist, noted on June 1, 2010 that Plaintiff complained of shortness of breath and decompensation in the last few days.  He started Plaintiff on aspirin, Plavix and heparin, and scheduled him for left heart catheterization.  AR 218.

   Dr. Tali H. Arik reported that an angiogram on June 2, 2010 showed that the left ventricle was markedly dilated and severely hypokinetic globally with an estimated ejection fraction of 10%

without mitral insufficiency.  There was no evidence of significant focal obstructive coronary artery disease and no evidence of coronary calcification.  AR 216.  The hospital discharge report stated that Plaintiff was diagnosed with Non-ST segment myocardial infarction, severe dilated cardiomyopathy, hypertension, and diabetes mellitus.  AR 250.  An echocardiogram showed the left ventricle to be severely dilated with an ejection fraction of 10% to 15%, that the right ventricle was severely hypokinetic, and the atria bilaterally were severely dilated.  AR 250.  On June 4, 2010, a dual chamber implantable cardioverter defibrillator ("AICD") was placed in Mr. Cunningham's chest.  AR 250, 256.   He did well after the procedure and did not complain of chest pain or shortness of breath.  AR 250.  Mr. Cunningham was prescribed Plavix, Lisinopril, Coreg, and Zocor and was instructed to follow-up with the cardiologist, Dr. Gururaj, in 8 to 10 days and with a primary care provider in one week.  AR 251.

Mr. Cunningham was thereafter admitted to Sunrise Hospital on June 16, 2010 with a chief complaint of shortness of breath.  AR 276.  He reported shortness of breath for the past two months which became progressively worse to the point where he could barely walk a few steps.  He also complained of chest discomfort.  During this hospitalization, Plaintiff underwent a Lexiscan stress test which showed the left ventricles to be normal in size on stress and rest.  His ejection fraction was approximately 15%.  A 2D echocardiogram confirmed 4-chamber dilated cardiomyopathy with global hypokinesis and ejection fraction estimated at approximately less than 20% with mild mitral regurgitation.  AR 274.  Plaintiff's medications were optimized to best control congestive heart failure  exacerbation.  The physical therapy department stated that Plaintiff would benefit from rehabilitation at a skilled nursing facility, but this could not be arranged due to his inability to pay.  AR 274.  During the hospitalization, physical therapy was able stabilize Plaintiff enough to clear him for discharge home in stable condition on June 23, 2010.  Plaintiff was advised to follow-up with Dr. Singh.  AR 277.

Mr. Cunningham was seen by Dr. Fred Schaller at Cardiovascular Consultants of Nevada on July 27, 2010.  AR 312-317.  Dr. Schaller noted that Plaintiff had previously been admitted to Valley Hospital with congestive heart failure and was found to have no significant coronary disease, but had an ejection fraction of 10% and that an AICD was implanted.  AR 312.  Dr.

7

Schaller further noted that Mr. Cunningham had been laid off from his job and was seeking disability. Plaintiff reported that, since his discharge from the hospital, he had a difficult time paying for his medications and for home oxygen. He reported continued fatigue and shortness of breath. Dr. Schaller stated that "[h]e can do very little on his New York Heart Association functional class III." AR 312. He stated that Plaintiff was not experiencing new orthopnea (shortness of breath at rest), although he still had some orthopnea. Under "Impressions/Plan," Dr. Schaller stated Plaintiff had nonischemic dilated cardiomyopathy with ejection fraction of 10%; that his symptoms were not optimally controlled and that he was a New York Heart Association functional class II.[1] Because of financial limitations, Plaintiff was not on all of the medications he should receive for his dilated cardiomyopathy. Dr. Schiller stated that Plaintiff was obese and had a history of smoking, alcohol and drug abuse. AR 313. Dr. Schaller stated that Plaintiff "may be a candidate for a left ventricular assist device and/or transplant." He noted, however, that Plaintiff was very reluctant to consider this and had no mechanism to pay for such treatment. AR 313. Dr. Schiller also wrote a handwritten letter on July 27, 2010 in which he stated that Mr. Cunningham was currently New York Heart Association functional class III, was unable to work and qualified for total disability. AR 315.

Plaintiff was seen at the UMC Quick Care clinic on August 10, 2010. He reported that he had slipped six hours before and was suffering from lower back pain. AR 332. On August 12, 2010, he was seen by Dr. John Bowers at Nevada Heart and Vascular Center to establish cardiology care. AR 370. Dr. Bowers briefly summarized Plaintiff's prior care at Valley Hospital. He noted that Plaintiff had not had any discharges or untoward events since then and "seems to be doing pretty well." AR 370. Dr. Bowers indicated that his physical examination of the Plaintiff was essentially normal. He noted 1-2+ edema in the extremities. AR 370-371. Under "Discussion," Dr. Bowers stated: "Dilated cardiomyopathy, nonischemic. His ejection fraction was estimated at 10% to 15%." He scheduled Plaintiff to follow-up in 3 months. Dr. Bowers advised Plaintiff to seek a primary care doctor and to continue aggressive medical therapy. AR 371.

---

[1] Elsewhere in his report, Dr. Schaller stated that the Plaintiff was "class III."

Plaintiff was seen by Dr. Miguel Sepulveda at University Medical Center (UMC) on August 27, 2010. AR 325-332. He complained of mild back pain. AR 325-326. X-rays of lumbar spine indicated that he had very mild lumbar spondylosis. AR 331. Plaintiff returned to UMC on September 30, 2010, to check on his medications and get X-Ray results. The intake form indicated that he had zero pain and he was advised to return in one month. AR 322. The Plaintiff returned to UMC on October 15, 2010 at which time he indicated very minor pain (0-1 on a scale of 1 to 10). AR 319.

On October 28, 2010, Plaintiff saw Dr. Bowers at Nevada Heart and Vascular Center for a routine followup. AR 368. Dr. Bowers noted that Plaintiff had given up smoking since the placement of the pacemaker in June 2010. Plaintiff had been taking his medications and was gradually feeling better. AR 368. Dr. Bowers' physical examination findings were essentially normal. AR 368-369. Under "Discussion," Dr. Bowers stated: "Severe dilated cardiomyopathy, indwelling ICD, functional class II to III. We did not change any of his medicines. He is encouraged to increase his activity level as tolerated. We did give him a prescription for Levitra for p.r.n. use. He is congratulated on staying away from the cigarettes." Dr. Bowers scheduled Plaintiff for follow-up after four months. AR 369.

Mr. Cunningham was next seen by Dr. Bowers on February 3, 2011. AR 365. He noted that Plaintiff "has been feeling pretty well" and reported "doing low-level activity, helping out at the church." AR 365. He had no new untoward cardiovascular problems. An echocardiogram performed on January 27, 2011 showed an improvement in his ejection fraction from 15% to 35% which Dr. Bowers characterized as "still in a moderate to severe reduced range, but much improved from his prior study." AR 365. Under "Discussion," Dr. Bowers stated:

> Idiopathic dilated cardiomyopathy. Ejection fraction is still only 35%. He is still in the moderate to severe reduced ejection fraction to still be considered disabled from a cardiac standpoint. We gave him the okay to gradually improve or increase his exercise as tolerated.

AR 366.

Dr. Bowers also noted that Plaintiff's blood sugars "have been very labile and for the most part have been above 200. We suggested he institute more aggressive insulin regimen with

9

increasing his dose and then more likely than not, he will need multidosing during the day and definitely needs more aggressive long-term follow up with the endocrinologist." AR 366. Dr. Bowers scheduled Plaintiff for follow up in six months or sooner if any problems arose.

A state agency physician, Dr. William Dougan, prepared a Physical Residual Functional Capacity Assessment of Plaintiff on February 12, 2011. AR 348-355. He found that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently. AR 349. Plaintiff could stand and/or walk, and sit for up to six hours in an eight hour workday. He had no limits on his ability to push or pull. He could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs. AR 350. He could never climb ladders, ropes, or scaffolds. Plaintiff had no manipulative, visual, or communicative limitations. AR 351-352. He needed to avoid exposure to extreme heat or cold, and to hazards, but was not limited by wetness, humidity, noise, vibration, fumes, odors, gases, or poor ventilation. AR 352. Dr. Dougan found that the objective findings did not support Plaintiff's allegations regarding the severity of his symptoms. AR 353.

The Plaintiff was seen by Dr. Bowers on February 24, 2011 which was less than a month after his previous visit on February 3, 2011. AR 363. Dr. Bowers noted the Plaintiff was running low on medications. He complained of a dry hacking cough with lisinopril, although the medication "has been working well for him." AR 363. Dr. Bowers stated that Plaintiff was still pretty severely disabled. He was unable to walk more than a block without shortness of breath. He noted that Plaintiff's ICD (defibrillator) "has not fired for arrhythmias." Physical examination findings were essentially normal. AR 363. Dr. Bowers prescribed losartan to try to eliminate Plaintiff's cough and encouraged him to continue with his blood pressure medication. Dr. Bowers noted that Plaintiff's ejection fraction was 35%, and he still classified Plaintiff as class II to III heart failure with dyspnea on minimal exertion. Under "Plan," Dr. Bowers stated that he would see Plaintiff in six months. He further stated that Plaintiff "is clearly too symptomatic to do any strenuous work. Hopefully, he will get some assistance for his disabled state." AR 364.

Plaintiff returned to see Dr. Bowers on March 17, 2011, less than a month after his prior visit. AR 361. Plaintiff reported tingling in his fingers and arms. He also reported some mild, vague chest discomfort that came on at night, but not so much when he was up and moving around.

1    AR 361.  Dr. Bowers noted that Plaintiff's defibrillator had not gone off, and he had no true

2    anginal like symptoms.  The physical examination findings were again essentially normal.  AR 361.

3    Under "Discussion," Dr. Bowers stated that "[f]rom a cardiac standpoint, he seems to be doing

4    fine."  AR 362.  He stated that Plaintiff should have better control of his blood sugars.  Plaintiff's

5    blood pressure was under control.  Dr. Bowers scheduled Plaintiff for follow-up in about three to

6    four months.  AR 362.

7         A state Agency physician, Dr. Elsie Villaflor, prepared a Physical Residual Functional

8    Capacity Assessment of Plaintiff on June 13, 2011.  AR 392-399.  Dr. Villaflor stated that the

9    Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  AR 393.  He could stand

10   and/or walk at least two hours in an eight hour workday, and could sit for six hours in an eight hour

11   workday.  He was not limited in the ability to push or pull during work.  He could frequently

12   balance, stoop, kneel, crouch, and crawl.  He could occasionally climb ramps or stairs, but could

13   never climb ladders, ropes, or scaffolds. AR 394.  Plaintiff had no visual, communicative, or

14   manipulative limitations.  AR 395-396.  He had no limits in wet, noisy, humid, or vibrating

15   environments, but must avoid concentrated exposure to extreme cold and extreme heat, and avoid

16   even moderate exposure to hazards such as machinery or heights.  AR 396.  Dr. Villaflor concluded

17   that the Plaintiff's symptoms were attributable to a medically determinable impairment.  AR 397.

18        Plaintiff was again seen by Dr. Bowers on September 20, 2011.  Plaintiff reported

19   increasing ankle swelling.  He also stated that he had been feeling sluggish, weak, and short of

20   breath.  Dr. Bowers noted that "[h]is sugars have been out of whack.  It is running in the 300-400

21   range quite often."  AR 416.  Plaintiff weighed 344 pounds: a 22 pound increase from his previous

22   visit in March, 2011.  AR 416, 361.  On physical examination, Plaintiff had 2+ pitting edema to the

23   high thigh.  Otherwise, the physical examination was essentially normal.  Under "Plan," Dr.

24   Bowers indicated that Maxzide would be added to Lasix.  "We will try to get control of his lower

25   extremity edema."  Plaintiff was advised to increase his daily insulin, and the plan was to take a

26   more aggressive approach to control his blood sugars.  Dr. Bowers concluded:  "Obviously, he is

27   disabled, unable to do meaningful work at this point; hopefully, will improve his physical status

28   enough to getting back to work at some point."  AR 417.  Dr. Bowers next saw Plaintiff on

1   December 22, 2011.  AR 407.  Plaintiff indicated that he was feeling a little better.  His blood

2   sugars were still in the 200-300 range and he was having a little trouble coordinating his insulin.

3   AR 407.   His weight was reported as 321 pounds and he was advised to start losing weight at the

4   rate of one pound per week for the next six months.  AR 408.

5          On February 10, 2012, Plaintiff was seen by Dr. Girish H. Daulat at Community Family

6   Doctors, Ltd. for a physical and to re-check his diabetes.  AR 404.  Dr. Daulat noted that Plaintiff

7   suffered from diabetes, obesity, hyperlipidemia, cardiomyopathy, congestive heart failure, CAD,

8   lumbar disc disease, smoking addiction, polyneuropathy in diabetes, and right bundle branch block.

9    He recommended monitoring Plaintiff's feet to ensure no injuries occur, and advised him to diet to

10  keep his weight down.  On April 13, 2012, Plaintiff saw Dr. Daniel Batlan for an initial pain

11  management evaluation.  AR 418.  Plaintiff reported pain in his lower back, buttocks, and lower

12  extremities at a level of 8 on a scale of 1 to 10.  Plaintiff requested a prescription for oxycodone

13  which was granted.  AR 420.

14         On May 25, 2012, an echocardiogram was performed on Plaintiff at Nevada Heart and

15  Vascular Center which revealed that Plaintiff's ejection fraction was 28%.  AR 466.  Dr. Robert

16  Berkley noted that the Plaintiff had moderate left ventricular enlargement and moderate global

17  hypokinesia.  *Id*.  He also noted that it was a "[t]echnically difficult study" and he recommended

18  that a MUGA study be considered for a better evaluation of the ejection fraction.

19         The ALJ referred Mr. Cunningham for further medical evaluations following the May 9,

20  2012 hearing.  On May 30, 2012, Dr. Zev Lagstein, cardiologist, examined Plaintiff at the request

21  of the Bureau of Disability.  AR 434-437.  Dr. Lagstein noted that Plaintiff weighed 285 pounds.

22  Plaintiff reported that he smoked ten cigarettes a day, which he had done for the past seven years.

23  Plaintiff also stated that he occasionally consumed alcohol.  Plaintiff drove a car and was capable

24  for caring for himself.  AR 434.  Dr. Lagstein stated that Plaintiff's chief complaint was easy

25  fatigability without chest pain.  Plaintiff stated that he was only capable of walking half a block at a

26  slow pace and found it difficult to climb a flight of stairs.  AR 435.  Dr. Lagstein's physical

27  examination findings were essentially normal.  He stated that "[t]he echocardiogram revealed poor

28  chamber dilation with an ejection fraction of 36%.  AR 436.  Under "Impression," Dr. Lagstein

stated that Plaintiff had:

> Nonischemic dilated cardiomyopathy with an ejection fraction of
> 86%,[2] unchanged from prior.  Much improvement compared to the
> ejection fraction of 10% in 2010.  The claimant is still complaining
> of poor exercise tolerance and shortness of breath on exertion.  There
> is no  evidence of overt congestive heart failure.

   AR 437.

   Dr. Lagstein also found that Plaintiff was morbidly obese, had hypertension, and diabetes.
He found no evidence of sleep apnea.  AR 437.

   Dr. Lagstein completed a residual functional capacity checklist form.  AR 438-443.  He
stated that the Plaintiff could lift and carry up to 50 pounds occasionally, and up to 20 pounds
continuously.
AR 438.  Plaintiff could sit for five hours continuously, stand for one hour, and walk for 30
minutes.  AR 439.  Plaintiff could sit for eight hours in an eight hour day, and could stand or walk
for two hours.  Plaintiff did not require the use of a cane.  He had no limitations in the use of his
hands or feet.  AR 440.  He could occasionally balance, stoop, kneel, crouch, crawl, and climb
stairs, ramps, ladders, and scaffolds.  AR 441.  He could not tolerate unprotected heights, extreme
cold, or extreme heat.  AR 442.  He could occasionally tolerate dust, odors, fumes, and pulmonary
irritants.  *Id*.  He could frequently tolerate moving mechanical parts, humidity and wetness, and
operate a motor vehicle.  He had no limitations with regard to noise.  Dr. Lagstein also stated that
Plaintiff could shop for himself, travel without a companion, move without an assisting device, use
public transportation, walk a block at a reasonable pace despite uneven surfaces, climb a few steps
without the use of a handrail, feed himself, care for his own hygiene, and sort, handle, or use papers
and files.  AR 443.

   On June 21, 2012, Dr. Simon J. Farrow performed a neurological evaluation of Plaintiff at
the request of the Bureau of Disability.  AR 447-449.  Dr. Farrow's neurological examination
findings were "consistent with mild to moderate polyneuropathy and diabetes and possibly

---

[2] Dr. Lagstein's reference to an ejection fraction of 86% appears to be typographical error.  The
ALJ, however, discounted the credibility of Dr. Lagstein's report based on this error.  AR 26.

superimposed carpal tunnel syndrome." AR 448.  He noted, however, that "[i]t is difficult to distinguish between carpal tunnel syndrome as such and the typical disproportionate focal abnormality of distal sensory conduction in median nerves often associated with diabetes."  AR 448.

Dr. Farrow also completed a residual functional capacity checklist form.  He found that Plaintiff could continuously lift and carry up to 10 pounds, could frequently carry and lift up to 20 pounds and could occassionally lift up to 100 pounds, but could never carry more than 50.  AR 450. Plaintiff could sit for two consecutive hours, and up to seven hours in an eight hour workday.  AR 451.  He could stand for only an hour at a time, but could stand for four out of eight hours.  Plaintiff could walk for an hour at a time, but could only do so for three out of eight hours in a workday. Plaintiff was limited to frequently reaching overhead, but otherwise had no limitations in the use of his hands.  AR 452.  He could frequently operate foot controls.  Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl.  AR 453.  He could frequently climb stairs or ramps, but never climb ladders or scaffolds.  He could not be around unprotected heights.  AR 454.  He could frequently work with moving mechanical parts, humidity, wetness, dusts, odors, fumes, and pulmonary irritants.  He could occasionally tolerate extreme heat, extreme cold, or vibrations. He could tolerate loud noise but not very loud noise. Plaintiff could shop for himself, travel without a companion, move without an assisting device, use public transportation, walk a block at a reasonable pace despite uneven surfaces, climb a few steps without the use of a handrail, feed himself, care for his own hygiene, and sort, handle, or use papers and files.  AR 455.

## C.    ALJ's Decision

In his decision dated August 9, 2012, Administrative Law Judge Barry H. Jenkins determined that Plaintiff was not disabled from June 24, 2010, through the date of the decision because the Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  AR 29.  In reaching this conclusion, the ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f).  At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015, and that he had not engaged in substantial gainful activity (SGA) since July 1, 2008.  AR 23.

At step two, the ALJ found that the Plaintiff had the following severe impairments: cardiomyopathy, status post implantation of an inflatable cardioverter-defibrillator (ICD), disorders of the back, and obesity.  AR 23.  The ALJ noted that the Plaintiff suffers from diabetes, hypertension, carpal tunnel syndrome, sleep apnea, and hyperlipidemia.  *Id*.  He found, however, that these conditions had only a minimal effect on the claimant's ability to work and therefore were not severe impairments.  AR 23-24.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ stated in this regard:

> The claimant's impairments are evaluated based on criteria set forth in Listings 1.04, 4.02, 4.04, and 4.05.  The medical evidence does not document Listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

AR 24.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to do sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a).  AR 24.  The ALJ further stated that Plaintiff "is limited to occasional postural activities, but is precluded from climbing ropes, ladders, or scaffolds; he must avoid concentrated exposure to extreme temperatures, excessive vibration, chemicals, and pulmonary pollutants; he must avoid even moderate exposure to hazardous machinery, unprotected heights and operational control of moving machinery; and, he requires a sit/stand option."  AR 24.

In assessing Plaintiff's residual functional capacity, the ALJ considered only his cardiomyopathy, back pain, and obesity.  AR 24-25.  The ALJ stated that Plaintiff's diabetes, hypertension, carpal tunnel syndrome, sleep apnea, and hyperlipidemia had already been addressed in Finding 3 in which he concluded that they were not "severe impairments."  AR 24.  The ALJ noted Plaintiff's hearing testimony that his heart condition prevents him from working because he is always short of breath.  He also noted Plaintiff's testimony regarding the tingling in both his arms and legs.  The ALJ stated that despite these problems, Plaintiff acknowledged that he was the primary caregiver for his three young children and took care of their daily needs, including making

15

them breakfast, getting them dressed and ready for school, and cleaning after them as necessary. AR 25.  The ALJ also noted Plaintiff's testimony that he went grocery shopping twice a week, did some laundry, and washed dishes.  The ALJ concluded that while Plaintiff's medically determined impairments could reasonably be expected to cause his alleged symptoms, his statements regarding the intensity, persistence, and limiting effects of these symptoms were not credible.  AR 25.

After briefly summarizing Plaintiff's heart condition and the medical treatment he received in June 2010, the ALJ stated that "[b]y August 2010, the claimant's heart condition appeared to have improved, and he reported doing well at follow-up appointments for his cardiomyopathy." AR 25.  The ALJ noted that "[b]y February 2011, the claimant continued to improve, reporting that he was feeling well, and his ejection fraction significantly improved from 15% to 35%."  The ALJ noted that "by December of 2011, the claimant's cardiovascular system was significantly improved so as to be generally unremarkable."  AR 25.  In regard to Plaintiff's back pain, the ALJ noted that the August 2010 x-rays showed "[o]nly very mild lumbar spondylosis."  The ALJ generally indicated that the treatment Plaintiff received for his heart and other medical conditions "was conservative in nature and consisted primarily of medication monitoring, diagnostic testing as appropriate and routine follow-up care."  AR 25-26.

The ALJ found that the medical records "casts doubt" on the Plaintiff's credibility as to the severity of his limitations because they indicated significant improvement in his condition over time.  The ALJ also discounted the credibility of Plaintiff's complaints of shortness of breath given that he continued to smoke two to ten cigarettes a day.  He also found that Plaintiff's credibility regarding the severity of his symptoms was diminished by his ability to care for his young children, which indicated "a fairly high level of functioning that is generally inconsistent with a claim of total disability as many of the physical and emotional skills necessary to perform these activities are the same as those necessary for obtaining and maintaining employment."  AR 26.

In regard to the medical opinion evidence, the ALJ gave "some weight" to the state agency medical consultants who assessed Plaintiff as capable of performing light work.  He found these opinions to be consistent with the documentary evidence of record, including that of the neurological physician, Dr. Farrow, who examined Plaintiff in June 2012.  AR 26.  He found,

16

however, that the state agency physicians "failed to give adequate consideration to the claimant's subjective complaints, nor did they take into account the combined effects of his multiple impairments."  For the same reasons, he also gave little weight to the cardiology consulting opinion of Dr. Lagstein.  AR 26.  The ALJ also rejected the opinions of Plaintiff's treating physicians, Dr. Schaller and Dr. Bowers, that Plaintiff was totally disabled from work.  AR 26-27.  The ALJ stated that their opinions were not controlling because "it is not clear that they were familiar with the definition of disability as contained in the Social Security Act and regulations."  AR 27.  He also found that their opinions were not specific, and did not list the objective medical findings upon which they were based.  He also stated that their opinions were inconsistent with the medical record which detailed relatively unremarkable symptoms following the successful implantation of the ICD.  AR 27.

Lastly, the ALJ stated that he gave consideration to Plaintiff's extreme obesity.  He acknowledged that Plaintiff's obesity impacts on his ability to ambulate as well as his other body systems.  He stated, however, that he had considered Plaintiff's obesity within his determination of Plaintiff's functional limitations and as an additional reason for limiting Plaintiff to sedentary level work.  AR 27.

Based on his determination that Plaintiff had the residual functional capacity to perform only sedentary work, the ALJ concluded at step four of the evaluation process that Plaintiff was not able to perform his past relevant work which was at the light or higher exertional level.  AR 27.  Based on the vocational expert's testimony, the ALJ concluded at step five of the sequential process that Plaintiff could perform the sedentary jobs of general office clerk, information clerk, or order filler.  Although the occupational base for these jobs was somewhat eroded by the requirement of a sit/stand option, the ALJ concluded that "a significant number of jobs exist in the economy which would be consistent with the claimant's residual functional capacity."  AR 28- 29.

**DISCUSSION**

**I.    Standard of Review.**

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

1

## II.    Disability Evaluation Process

2          To qualify for disability benefits under the Social Security Act, a claimant must show that:

3          (a)    he/she suffers from a medically determinable physical or mental
4                 impairment that can be expected to result in death or that has lasted
                  or can be expected to last for a continuous period of not less that
                  twelve months; and

5          (b)    the impairment renders the claimant incapable of performing the
6                 work that the claimant previously performed and incapable of
7                 performing any other substantial gainful employment that exists in
                  the national economy.

8    *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

9          The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179,

10   182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to

11   perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can

12   perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157

13   F.3d 715, 721 (9th Cir. 1998).

14         Social Security disability claims are evaluated under a five-step sequential evaluation

15   procedure. *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

16   2001).  If a claimant is found to be disabled, or not disabled, at any point during the process, then

17   no further assessment is necessary.  20 C.F.R. § 404.1520(a).  At the first step, the Commissioner

18   determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b).

19   If so, the claimant is not considered disabled. *Id.* § 404.1520(b).  Second, the Commissioner

20   determines whether the claimant's impairment is severe. *Id.* § 416.920(c).  If the impairment is not

21   severe, the claimant is not considered disabled. *Id.* § 404.152(c).  Third, the claimant's impairment

22   is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1.  The claimant

23   will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* §

24   404.1520(d).  If a listed impairment is not met or equaled, the fourth inquiry is whether the

25   claimant can perform past relevant work. *Id*. § 416.920(e).  If the claimant can engage in past

26   relevant work, then no disability exists. *Id.* § 404.1520(e).  If the claimant cannot perform past

27   relevant work, the Commissioner has the burden to prove the fifth and final step by demonstrating

28   that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f).  If the Commissioner

19

1   cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

2   **III.    Analysis of the Plaintiff's Alleged Disability**

3   In his motion for remand, Plaintiff alleged that the Administrative Law Judge erred at step

4   three of the sequential evaluation process in finding that he did not have an impairment or

5   combination of impairments that meets or medically equals one of the listed impairments in 20

6   C.F.R. Part 404, Subpart P, Appendix 1. *Amended Motion for Remand (#25), pgs. 12-16.*

7   Although Plaintiff's former counsel argued in an October 8, 2012 letter to the Appeals Council, AR

8   207-214, that the ALJ erred at steps two, four and five of the sequential process, Plaintiff did not

9   raise these issues in his motion for remand.  The Commissioner accordingly limited his arguments

10  to the issue raised by Plaintiff's motion, i.e., whether Plaintiff met his burden to establish that he

11  satisfied the requirements of a particular listing at step three. *Defendant's Cross-Motion to Affirm*

12  *and Opposition to Plaintiff's Motion to Remand (#23, #24), pgs. 4-7.*

13  In his reply brief, Plaintiff argued for the first time that the ALJ improperly rejected the

14  opinions of the Plaintiff's treating physicians that he is disabled.[3]  Arguments raised for the first

15  time in a reply brief, however, are waived. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th 2010); *U.S.*

16  *ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 n. 1 (9th Cir. 2009); *Velasco-*

17  *Cervantes v. Holder*, 593 F.3d 975, 978 n. 2 (9th Cir. 2010), overruled on other grounds by

18  *Henriques-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013); *Cedano-Viera v. Ashcroft*, 324 F.3d

19  1062, 1066 n. 5 (9th Cir. 2003); and *U.S. v. Alcan Elec. and Engineering, Inc.*, 197 F.3d 1014,

20  1020 (9th Cir. 1999).  As apparent grounds for raising this argument for the first time in his reply,

21  Plaintiff argues that *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. 2014) provided new authority.[4]

22  *Garrison* clarified the standards under which a court may make a final determination that a

23  claimant is disabled and remand the case to the Social Security Administration with the direction to

24  pay benefits, rather than remand it for further administration determination on the issue of

25

26      [3] The treating physicians generally opined that Mr. Cunningham was disabled or unable to work.
    They did not address whether Mr. Cunningham's impairments meet or medically equal a listed impairment

27  under 20 C.F.R. Part 404, Subpart P, Appendix 1.

28      [4] *Garrison* was decided on July 14, 2014–after Plaintiff filed his motion to remand.

1  disability.  *Garrison* did not establish any new law for determining whether an ALJ improperly

2  rejected the testimony of the claimant or the opinions of his treating physicians.  *Garrison* therefore

3  provides no grounds for Plaintiff to raise such issues for the first time in his reply brief.  The Court

4  will therefore limit its review to whether the ALJ erred in finding that Plaintiff did not meet or

5  medically equal a listing.

6      In finding that Plaintiff did not have an impairment or combination of impairments that

7  meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404,

8  Subpart P, Appendix 1, the ALJ stated that "[t]he medical evidence does not document Listing-

9  level severity, and no acceptable medical source has mentioned findings equivalent in severity to

10  the criteria of any listed impairment, individually or in combination."  AR 24.  Plaintiff argues that

11  this was "a cursory and inadequate glossing-over of the severity of Plaintiff's condition."  *Amended*

12  *Motion (#25), pg 15*.  Plaintiff also argues that his "prior counsel expressly pointed out at the

13  hearing, and raised generally in her Appeals Council memorandum (Tr. 49, 206-14), [that] Plaintiff

14  comes very close to meeting a cardiac listing."  *Id., pg. 12.*  The Court notes, however, that

15  Plaintiff's former counsel did not contend at the hearing that Plaintiff, in fact, met or medically

16  equaled a listed impairment.  Nor was this argument raised or discussed in her subsequent letter to

17  the Appeals Council.  AR 206-214.

18      Plaintiff has the burden of proving that he is disabled at steps one through four of the

19  sequential evaluation process.  *Roberts v. Shalala*, 66 F.3d at 182.  *Burch v. Barnhart*, 400 F.3d

20  676, 683 (9th Cir. 2005) further states that a claimant "bears the burden of proving that . . . she has

21  an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the

22  Commissioner's regulations."  To meet the requirements of a listing, the claimant must have a

23  medically determinable impairment that satisfies all of the criteria in the listing.  20 C.F.R. §§

24  404.1525(d) and 416.925(d).   "For a claimant to show that his impairment matches a listing, it

25  must meet *all* the specified medical criteria.  An impairment that manifests only some of those

26  criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct.

27  885, 891 (1990).  A claimant can also satisfy his burden at step three by showing that his

28  impairment is medically equivalent to a listed impairment in Appendix 1 if it is at least equal in

21

severity and duration to the criteria of any listed impairment.  20 C.F.R. § 404.1526(a) and

416.926(a).  "A claimant must 'present medical findings equal in severity to *all* the criteria for the

one most similar listed impairment.'" *Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013),

quoting *Sullivan v. Zebley*, 493 U.S. at 531.

In support of his argument that he meets or medically equals a listed impairment, Plaintiff

quotes the general introduction in Listing 4.00 regarding cardiovascular impairments as follows:

> 1. What do we mean by a cardiovascular impairment?
>
> a. We mean any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage). The disorder can be congenital or acquired.
>
> b. Cardiovascular impairment results from one or more of four consequences of heart disease:
>
>> (i) Chronic heart failure or ventricular dysfunction.
>> (ii) Discomfort or pain due to myocardial ischemia, with or without necrosis of heart muscle.
>> (iii) Syncope, or near syncope, due to inadequate cerebral perfusion from any cardiac cause, such as obstruction of flow or disturbance in rhythm or conduction resulting in inadequate cardiac output.
>> (iv) Central cyanosis due to right-to-left shunt, reduced oxygen concentration in the arterial blood, or pulmonary vascular disease.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 4.00.

Plaintiff argues that the medical evidence in this case demonstrates that Plaintiff has "all

four of these consequences of heart disease." *Amended Motion (#25), pgs. 12-13.*  Plaintiff argues

that he satisfies Listing 4.02 Chronic Heart Failure.  *Id., pgs. 13-14.*  Specifically, the Plaintiff

claims that the combination of morbid obesity, uncontrolled diabetes, and cardiac failure combines

to equal 4.02: Chronic Heart Failure.  *Amended Motion (#25), pgs. 13-14.*  Plaintiff also alleges that

he meets listings 4.04(A)(1) and 4.11(B).

Listing 4.02 requires that the Plaintiff suffer from chronic heart failure in two respects.  This

requires:

> A. Medically documented presence of one of the following:
>
> 1. Systolic Failure with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

22

2. Diastolic failure, with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure); AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 4.02

Plaintiff argues that he meets a listing under 4.02 because he suffered from a low ejection fraction for much of 2010, and because he suffers from three or four consequences of heart disease: chronic heart failure, discomfort or pain due to myocardial infraction, and peripheral vascular disease. Plaintiff begins by noting the ejection fraction measurements for the Plaintiff of 17% in 2008, 10-15% in 2010, and 35% in 2011. Alternatively, Plaintiff's diastolic dimension was greater than 6.0 when measured on June 17, 2010, when it was determined to be 6.6 cm. AR 285. While this particular measurement would suffice under Listing 4.02, Plaintiff does not allege that the measurement was consistent for a period of 12 months or more. Likewise, Plaintiff did not

23

1
2
establish that his ejection fraction was below 30% for a period of 12 months or more during the

period of alleged disability.

3
4
5
6
7
8
9
10
Plaintiff argues that his medical history includes "Persistent symptoms of heart failure" as

described in Listing 4.02B.  Listing 4.02B requires that the symptoms lead a medical consultant to

conclude "that the performance of an exercise test would present a significant risk to the

individual."  Plaintiff does not argue that such a conclusion was ever reached by any medical

consultant.  While the Plaintiff's doctors had previously concluded that he was unable to work due

to his conditions, there is no evidence that any doctor or consultant concluded that an exercise test

may pose a significant risk to the Plaintiff's health.  Plaintiff has failed to establish that his

conditions are equal to those described in Listing 4.02.

11
12
13
14
15
Plaintiff also claims that he meets Listing 4.04, Ischemic Heart Disease.  Plaintiff does not

argue any of the specifics of this listing, stating only that "[t]he ALJ should have contacted

Plaintiff's treating cardiologists to obtain opinions as to the specific requirements set forth in

Listing 4.02, as well as Listing 4.04, ischemic heart disease."  *Amended Motion (#25), p. 14.*  In

order to meet Listing 4.04, Plaintiff would have to show one of the following:

> A. Sign-or symptom-limited exercise tolerance test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:
>
> 1. Horizontal or downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least −0.10 millivolts (−1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than aVR, and depression of at least −0.10 millivolts lasting for at least 1 minute of recovery; or
>
> 2. At least 0.1 millivolt (1 mm) ST elevation above resting baseline in non-infarct leads during both exercise and 1 or more minutes of recovery; or
>
> 3. Decrease of 10 mm Hg or more in systolic pressure below the baseline blood pressure or the preceding systolic pressure measured during exercise (see 4.00E9e) due to left ventricular dysfunction, despite an increase in workload; or
>
> 4. Documented ischemia at an exercise level equivalent to 5 METs or less on appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress echocardiography.
>
> OR
>
> B. Three separate ischemic episodes, each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12-month period (see 4.00A3e).

24

OR

C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence showing:

a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

b. 70 percent or more narrowing of another nonbypassed coronary artery; or

c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

e. 70 percent or more narrowing of a bypass graft vessel; and

2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 4.04

Plaintiff does not offer any specific evidence to show that he meets this listing, and has therefore failed to establish that his conditions are equal to those described in Listing 4.04.

Plaintiff also claims that he qualifies as disabled because he meets listing 4.11. Plaintiff does not expand upon this argument, stating only that "Plaintiff has the stasis dermatitis mentioned in Listing 4.11B." *Amended Motion (#25) p. 14.* Listing 4.11 specifically requires that the stasis dermatitis "has not healed following at least 3 months of prescribed treatment." Plaintiff does not argue that he was specifically treated for stasis dermatitis and offers no evidence of any such treatment. Plaintiff has failed to establish that he was disabled as described in listing 4.11.

The ALJ's conclusions are reasonably supported by inferences drawn from the record. The ALJ's opinion traces the Plaintiff's medical records during the alleged time of disability, beginning with the Plaintiff's treatment in June, 2010. He describes Plaintiff's conditions and the implanting of the ICD on June 4, 2010. AR 25. He noted that the Plaintiff's ejection fraction was only 15% on June 18, 2010. He then found that "the claimant's heart condition appeared to have improved" in August, 2010. *Id.* The ALJ also notes the rise in the Plaintiff's ejection fraction from 15% to

35% by February, 2011. *Id*. He cited the report from March, 2011, stating that the Plaintiff "was doing fine from a cardiac standpoint." *Id*. The ALJ found, based on the medical evidence presented, that Plaintiff's cardiovascular system in December, 2011, "was significantly improved so as to be generally unremarkable." *Id*.

The ALJ noted that the Plaintiff's obesity is a serious limitation that impacts his ability to ambulate and work. AR 27. The ALJ took this limitation into account in concluding that Plaintiff was able to perform at the sedentary level of exertion. Even if, as the Plaintiff argues, there may be a combination of elements that meet a listing, the Court is bound to uphold the decision of the ALJ if it is supported by the record as a whole. The record in this case shows that Plaintiff's heart condition was serious, but improving. The evidence does not establish that the Plaintiff meets Listings 4.02, 4.04, or 4.11. The ALJ therefore properly found that the Plaintiff did not meet or equal a listing.

**B.     The ALJ did not fail to adequately develop the record.**

An ALJ has "a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)). Because the claimant bears the burden of proving disability, the ALJ's duty to further develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Tonapetyan*, 242 F.3d at 1150. Plaintiff cites ALJ Jenkins' brief analysis at Step 3 as evidence that the ALJ failed to develop the record. Plaintiff argues that the ALJ has a duty to "explain adequately his evaluation of alternative tests and the combined effects of the impairments" when determining "whether a claimant equals a listing under step three of the Secretary's disability evaluation process." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). Plaintiff further argues that the ALJ did not properly develop the record because he failed to obtain additional testimony from the Plaintiff's treating cardiologist as to the specific requirements of the listings.

ALJ Jenkins discussed his evaluation of the Plaintiff's heart conditions throughout his opinion, albeit not under the specific headline for Step 3. As discussed above, the ALJ properly analyzed the record through his examination of the Plaintiff's medical history. He noted the

Plaintiff's improvement in overall health and in his heart conditions after the implantation of the ICD.  The ALJ found that the Plaintiff's symptoms were thereafter "relatively unremarkable," and that the prescribed conservative treatment was "consistent with those symptoms." AR 27.

The ALJ did not err in failing to seek out additional opinions from the Plaintiff's treating cardiologist.  The ALJ need not request further explanation from treating physicians when "substantially all of their medical records" were before the ALJ and when the records said "nothing unclear or ambiguous." *McLeod v. Astrue*, 640 F.3d 881, 884.  Plaintiff alleges that the ALJ needed to contact the Plaintiff's treating cardiologist "to obtain opinions as to the specific requirements set forth in Listing 4.02, as well as Listing 4.04, ischemic heart disease." *Amended Motion (#25) p. 14.*  Plaintiff does not allege what facts the ALJ was missing, and offers no explanation as to why the ALJ could not determine if the Plaintiff met a listing based on the unambiguous medical record before him.   The Court finds that the ALJ did not fail to properly develop the record.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#22, #25) be **denied**, and that the Defendant's Cross Motion to Affirm (#24) be **granted**.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

**DATED** this 2nd day of July, 2015.

**GEORGE FOLEY, JR.**
**United States Magistrate Judge**